JIGO F. BLEYER, Appellant, v. WILLIAM H. BLEYER, ADRIEN S. BLEYER, CLIFFORD M. BLEYER and MILDRED M. BLEYER.

JENNIE BLEYER, Appellant, v. WILLIAM H. BLEYER, ADRIEN S. BLEYER, CLIFFORD M. BLEYER and MILDRED M. BLEYER.

### Division One, March 31, 1909.

1. **FRAUD: Fiduciary Relation: Proof.**  A fiduciary relationship may be shown under a general allegation of fraud.

2. ——: ——: **Proof of Utmost Fairness.**  Whether or not in a case where actual fraud is alleged, but no fiduciary relationship between the parties is alleged, and the proof tends to prove actual fraud and also the fiduciary relationship, it is incumbent upon the person who is made the grantee in written instruments to show the utmost fairness, is not decided in this case, because if such burden was on the grantors they have successfully carried it.

3. ——: ——: **Conveyance of Property in Trust.**  Plaintiffs were old, decrepit  and in distress over the condition of their brother, who had suddenly become insane, and who had been their support and stay, and from whom they had obtained by gift what property they owned.  They conceived that their afflicted brother was wrongfully deprived of his liberty, and called upon their nephew, who was strong and had been their agent and adviser, to render them assistance in obtaining his release.  This nephew and another brother conceived a plan by which all the property of the afflicted brother and of plaintiffs might be placed in them in trust for the purposes of management and administration, and in pursuance of that plan the nephew obtained a separate deed from each of the plaintiffs by which they conveyed all their real estate and money to him as trustee for their use during their lives and after their death to him, his daughter and other nephews absolutely, with full power in the trustee to sell, loan, mortgage or reinvest, as to him might seem best, and all without bond.  The fiduciary relationship was clearly established, and the evidence establishes that the instruments were not entered into understandingly by plaintiffs.  *Held*, that they should be set aside.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

REVERSED (*with directions*).

*Wm. R. Gentry* for appellants.

(1) This being an equity case, this court is not in any sense bound by the finding of the trial court on questions of fact, but will examine and weigh the evidence for itself and make its own finding, independent of what the trial court may have believed the facts to be. Lins v. Lenhardt, 127 Mo. 280; Turner v. Overall, 172 Mo. 271. (2) Defendant William H. Bleyer, who drafted the deeds in question, stood in a fiduciary relation to the plaintiffs in a fourfold sense, to-wit: he was nephew, attorney, confidential adviser, attorney in fact and therefore agent. That he profited greatly and derived great advantage for himself and his little girl by reason of the execution of these deeds, no one can question. The burden is, therefore, upon him to explain and to show by the preponderance of the testimony, the utmost fairness, a complete understanding of the transactions by plaintiffs, utter lack of the least suspicion of fraud, and that plaintiffs were in a position to deal with him at arm's length. If he fails in this, the transaction is voidable at the option of plaintiffs. This is true, even in the absence of evidence of actual fraud, and is doubly true in view of plaintiffs' testimony in this case. This same rule applies, no matter what constitutes the fiduciary relation. Williams v. Gerber, 75 Mo. App. 18; Richards v. Pitts, 124 Mo. 602; Barrett v. Ball, 101 Mo. App. 288; Holtzman v. Linton, 27 Mo. App. 241; Evans v. Evans, 196 Mo. 1; Euneau v. Rieger, 105 Mo. 659; McClure v. Lewis, 72 Mo. 314; Street v. Goss, 62 Mo. 226; Gay v. Gillilan, 92 Mo. 250; Yosti v. Laughran, 49 Mo. 594; Condit v. Blackwell, 22 N. J. E. 481; Rub-

idoex v. Parks, 48 Cal. 215; Calmon v. Sarraille, 142 Cal. 638; Drefahl v. Bank, 107 N. W. 179; Webb v. Marks, 51 Pac. 518; Stokes v. Terrell, 23 So. 371; Teakle v. Bailey, Fed. Cases No. 13811; Barnard v. Gantz, 140 N. Y. 295; Darlington's Estate, 147 Pa. St. 624; In Greenfield's Estate, 14 Pa. St. 489; Cowee v. Cornell, 75 N. Y. 91. (3) The finding in each case is against the law and the evidence.

*Bond, Marshall & Bond* for respondents.

(1) The two petitions in this case do not state any causes of action. They do not allege that defendant William H. Bleyer occupied a fiduciary relation to either of the plaintiffs; nor do the two petitions pray for any relief against him based on any such status. Plaintiffs can only recover, if at all, upon the grounds for relief stated in their petition. This is the rule in equity as well as at law. Newham v. Kenton, 79 Mo. 382; Christian v. Ins. Co., 143 Mo. 469; Cole v. Armour, 154 Mo. 351; 9 Ency. Plead. & Practice, 690. (2) The two petitions are framed on the theory that plaintiffs supposed that the two deeds of trust, respectively, executed by them were powers of attorney only; that such representation was made to them by William H. Bleyer, and that in reliance thereon, they executed said deeds without reading them, and without any consideration. If these theories were true (which the record disproves) plaintiffs would not be entitled to set aside the executed trusts made by them for those reasons. Crim v. Crim, 162 Mo. 544; Och v. Railroad, 130 Mo. 44; Kellerman v. Railroad, 136 Mo. 189; Mateer v. Railroad, 105 Mo. 320; O'Bryan v. Kinney, 74 Mo. 125; Railroad v. Cleary, 77 Mo. 634; Johnson v. Ins. Co., 93 Mo. App. 590; Colin v. Reid, 18 Mo. App. 128. (3) An executed or completed trust needs no consideration to support it, and is irrevocable by the settlor. Ewing v.

Shannahan, 113 Mo. 195; Leeper v. Taylor, 111 Mo. 312; 1 Perry on Trusts (4 Ed.), sec. 104. (4) Appellate courts never reverse decrees in equity, which are in accord with the weight of the evidence. Not only so, but even where the evidence is evenly balanced, appellate courts defer to the finding of the chancellor. Tinker v. Kier, 195 Mo. 202; Parker v. Roberts, 116 Mo. 667; Downing v. Corcoran, 112 Mo. App. 650; Hartley v. Hartley, 143 Mo. 220. (5) The certificate of a notary is prima-facie evidence of the facts recited therein; but as to those facts (such as free execution of the instrument), stated by the party making the acknowledgment, the certificate cannot be overcome by a preponderance of contrary evidence, but only by extraneous evidence so ''strong and convincing'' that it must satisfy the mind of the court. The burden of proof is upon the party attacking the certificate to adduce such evidence. Springfield Eng. & T. Co. v. Donovan, 147 Mo. 633. (6) The overwhelming weight of the evidence, and in fact all of the credible evidence, shows that plaintiffs were fully aware of the two instruments of trust, when they executed them; and that with full knowledge of the provisions of said instruments, each of plaintiffs repeatedly thereafter ratified and affirmed said instruments of trust in all respects. (7) The record shows that William H. Bleyer, the trustee, agreed to act in that capacity for the protection of the grantors, and for the preservation of their property, and that he did this without charging any commission for his services, but solely to secure to the grantors good management of their estates, which was to continue during the lives of the grantors, and the instruments of trust further provide that whatever might be left of the trust estates, should go exactly as it would have gone if the grantors had died intestate.

GRAVES, J.—This cause is the consolidation of two causes of action. The consolidation was had in the circuit court of the city of St. Louis, wherein both were pending, but in different divisions of that court. The one cause was Jigo F. Bleyer v. William H. Bleyer, Adrien S. Bleyer, Clifford M. Bleyer and Mildred M. Bleyer, and the other was Jennie Bleyer, against the same defendants. The purpose of each suit was to set aside a deed in trust. Jigo F. Bleyer, in the evidence called Jake, on September 26, 1904, whilst in Queens county, State of New York, had executed a deed to defendant, William H. Bleyer, by the terms of which all the property of Jigo F. Bleyer, including valuable real estate in St. Louis and $10,000, were conveyed to William H. Bleyer in trust, which trust is thus crisply described in the deed:

"To have and to hold unto the said party of the second part, his successors and assigns forever, but in trust, nevertheless, for the purposes, objects and intents, and subject to the limitations, discretions and powers hereinafter declared and expressed as follows, to-wit:

"That said trust shall continue for and during the natural life of the party of the first part.

"During the life of the party of the first part the trustee shall pay over to him or expend for his benefit, monthly, the net income of the trust estate.

"On the death of the said Jigo F. Bleyer, the aforesaid party of the first part, the trust shall end and determine, and the trust estate, real, personal, and mixed, shall go to William H. Bleyer, Adrien S. Bleyer, Clifford M. Bleyer, Mildred M. Bleyer, nephews and grand niece of the said Jigo F. Bleyer, in equal parts, share and share alike."

By the further terms of the deed the trustee is given absolute control of the property, with full power to sell, loan, mortgage, reinvest as to him seemed best, and all this without bond.

The petition then charges that plaintiff at the time of the execution and delivery of the instrument, "had been and was in feeble health and was infirm in body and mind by reason of long continued sickness; that the defendant William H. Bleyer led the plaintiff to believe that the instrument so executed by him was a mere power of attorney, and the plaintiff relying upon such representations, executed the said instrument under the belief on his part that it was merely a power of attorney, and the plaintiff was without knowledge that the said instrument was of the kind and character it now proves to be, and in fact was at the time of its execution; that in the execution of the said instrument plaintiff did not intend to make a conveyance of any description of the property described in said instrument, to create the trust which said instrument on its face evidences, or to make any conveyance in trust for the benefit of the said defendants or either of them; that plaintiff was led by the said defendant William H. Bleyer to believe that the said instrument was of the kind and character which he claimed it to be, and the plaintiff executed the said instrument relying upon the representations and statements of the said defendant in that behalf made."

The petition also charges that the conveyance was without consideration. The prayer was for the cancellation of the deed and an accounting and a return of the $10,000.

On the same day and at the same place, Jennie Bleyer executed a similar deed, which conveyed real estate alone, however. The terms of the trust in the two deeds are identical, and the powers of the trustee the same.

The purpose of the suit of Jennie was to annul this deed, and an accounting of the rents and profits. She asks the cancellation upon these grounds as averred in her petition:

"That at the time of the execution of the said instrument plaintiff was infirm in body and mind; that she was a single woman without knowledge of the legal operation or effect of instruments of such character; that it was represented to her by the defendant, William H. Bleyer, that the instrument so executed by her was a power of attorney, and relying upon such representations she was led to execute the said instrument; that she did not intend by the execution of said instrument to create any trust or make a conveyance of any property for the benefit of the defendants or any other person, and that had she known or been led to understand the true character of the instrument it would never have received her signature, and she would not have permitted it to have been delivered to the defendant.

"Plaintiff states further that no consideration for the said instrument proceeded to her from any person or any quarter; that the instrument was purely a voluntary one upon her part, to whose execution she was led by the representations as to its real nature made to her by the defendant William H. Bleyer, that she executed the same and caused the same to be delivered in full reliance upon her part on the representations as to its real character so made to her."

By appropriate answer the alleged mental and physical conditions of the plaintiffs were denied and placed in issue, as were also the allegations that William H. Bleyer represented to them that the instruments were mere powers of attorney. In fact by appropriate language the answers placed in issue all the averments of the petitions save the allegation as to the execution and delivery of the written instruments. Trial was had before the Hon. Warwick Hough, as the chancellor, *nisi,* and he concluded the cases with these remarks, as we find them in the printed record: "The case is one that stands solely upon the weight of the testimony and nearly all of the parties to the

suit testified on the trial, and the direct testimony is irreconcilably conflicting. There are a great many facts and circumstances, and a great deal of correspondence between the parties, which shed light upon the true state of affairs. It would be a very unpleasant task to review the testimony in detail and state what the court believes to be true and what does not wear the hue of verisimilitude. It is sufficient to say that after a careful review of the testimony I have reached the conclusion that the finding should be for the defendants in both cases, and that plaintiffs' bills should be dismissed, and it will be so ordered.''

Some history of the Bleyer family appears in the record, thus: The Bleyer family was originally made up of one girl, Jennie Bleyer (plaintiff), and five boys, Samuel T. Bleyer, Dore L. Bleyer, Charles E. Bleyer, William M. Bleyer, and Jigo F. Bleyer (plaintiff). Some fifteen years before the transaction out of which this lawsuit grows, William M. Bleyer died leaving surviving him two sons, William H. Bleyer and Adrien S. Bleyer, one a lawyer and the other a doctor, and both beneficiaries in these deeds, and defendants herein. Clifford M. Bleyer is a son of Charles E. Bleyer, and Mildred M. Bleyer is the daughter of William H. Bleyer.

On September 26, 1904, the date of these deeds, the Bleyer family consisted of Jennie, aged 62; Samuel T., aged 57; Charles E., aged 46; Clifford M. (son of Charles E.), aged 23; William H., aged 30, and Adrien S., aged 26 (sons of William M., deceased); and Mildred M., daughter of William H. Of the original six, Jennie, Samuel T., Dore L., and Jigo never married.

Shortly prior to and at the time of these deeds, Samuel T. Bleyer, was the president of the Hawley Down Draft Furnace Company, of Chicago, from which he drew $10,000 per year as salary and some $3,000 as dividends. Samuel T., Jigo and Jennie had lived together a large portion of their lives. Charles E.

Bleyer was vice-president of the said Furnace Company and William H. Bleyer was also interested in said company. It also appears that the property Jennie and Jigo had came to them largely through the efforts of Samuel T. Bleyer.

In July, 1904, Samuel T. Bleyer left Chicago for Europe to meet his brother, Charles E., upon a business matter. About this time, Jennie and Jigo were traveling in the State of New York. From this point we have the interesting part of the history of this case. It comes from telegrams, cablegrams, letters, written documents, as well as from personal conversations.

From New York, August 1, 1904, Jennie telegraphed William H. as follows: "Sam arrived safely and met Charley. Am at Manhattan Hotel, New York."

And on same day, from same place, she telegraphed William H., thus: "Cable from Sam. Arrived safe. Met Charley. Have grass cut on Olive St. Lots. Address all mail to office here. Likely to return to Saratoga."

On August 6th, from Bristol Hotel, Berlin, Sam cabled to William H. as follows: "Secure options on Hawley shares below forty. Pay five dollars for privilege."

However, upon the receipt of this cablegram from Sam, William H. had left his home in St. Louis and gone to Jefferson Highlands, New Hampshire, to join members of his family who were spending the summer there. Upon reaching that place or within ten minutes thereafter, he received from Charles E. a cablegram from Berlin, reading: "Sam mentally unbalanced. Temporarily in Sanatorium. Can you come immediately. Get expense money from Drumm. Say nothing to folks."

Drumm was the Treasurer of the Hawley Company. William H. then cabled to Charles E. to bring Sam home.

On August 27th, from New York, Jennie telegraphed William H. at Laclede Building, St. Louis, thus: "Sam and Chas. arrived. Sam in poor condition. Telegraph me if Tuholske is East and his address. Can you come on here. Wire Murray Hill Hotel."

Tuholske was a physician known to the parties and William H. wired his address to Jennie, and also wired to Charles E. as to where he, William H., could meet him and Sam. He was advised by wire and letter that Sam had been placed in a sanatorium at Flushing, New York, on Long Island, and that he could do nothing for Sam, but that he might come on later and pacify Jennie. The letter also stated that Charles would be in Chicago on September 6th. William H. met Charles E. there on the 6th and discussed with him some matters pertaining to the Hawley Company, in which both were interested and upon which it is claimed that Charles E. had unloaded $10,000 of his debts by consolidating therewith another company which was owned by Charles E.

September 8, 1904, found William H. and Charles E. *en route* to New York and whilst *en route* it appears that Charles E. made inquiry of the property owned by Jennie and Jigo in St. Louis and was informed of its character. They also discussed the future of Jennie and Jigo, and Charles E. urged that this St. Louis property be made productive, as Sam's salary would soon stop and that he, Charles E., could not carry the whole burden of their support.

It seems that Jennie had not been permitted by the physician in charge of the sanatorium to see Sam, and William H. having knowledge of that fact, went to Flushing on September 10th with a letter to Dr. Brown of Sanford Hall, from Charles E. Bleyer. William H. first went to see Jennie and Jigo and then to the sanitarium to see Sam. He was there informed that Sam was incurably insane from paresis. This in-

formation he claims came from two eminent New York
physicians, Dr. Allan McLane Hamilton and Dr. Carlos
F. McDonald. After spending some time with Sam,
William H. then returned to the hotel where Jennie
and Jigo were stopping, and then told them of his
talk with Charles E. as to the St. Louis property. He
then suggested to them that Jigo's vacant lot could
perhaps be leased to advantage and that the vacant
lot belonging to Jennie ought to be sold and the money
put at interest. After this talk and on September
12th, both Jennie and Jigo signed separate powers of
attorney to William H., the one of Jigo's covering his
vacant lot, the one of Jennie's covering not only the
vacant lot, but the one upon which there was a house,
which was renting at $60 per month. These powers
of attorney were prepared by William H. and the sig-
nificant part thereof, if there is a significant part, is
couched in this language:

"Know All Men By These Presents: That I, Jigo
F. Bleyer of the county of Cook, State of Illinois, have
made and appointed and by these presents do make,
constitute and appoint William H. Bleyer of the city
of St. Louis, State of Missouri, my true and lawful
attorney for me and in my name, place and stead, and
for my use to grant, bargain and sell, lease, convey
in trust or otherwise dispose of the following lot,
tract or parcel of land situated in the city of St. Louis,
State of Missouri, to-wit: . . . . or any part
thereof for such price and on such terms, and for
such rents, to such person or persons as he shall think
fit and proper, and also for me and in my name and
as my act and deed to sign, execute, acknowledge and
deliver such deed, lease or conveyance in trust, or
other instrument either with or without covenants of
warranty and with such clauses, covenants or agree-
ments to be therein contained as my said attorney shall
think fit and expedient; hereby ratifying and confirm-
ing all such deeds, bargains, sales, leases, conveyances

in trust or other conveyances which shall at any time hereafter be made by my said attorney touching or concerning the premises.''

The one by Jennie is in substantially the same language.

William H. remained at Flushing until the 13th when he started for St. Louis. During this time he claims that he looked for a better institution for Sam, but not finding one advised Jennie to let him remain there until he could investigate around Chicago and St. Louis, with the view of getting him closer to home. Charles E., who remained in New York, on September 17th wrote William H. a letter, in which he first describes Sam's condition, then that the doctor had no objection to Jennie seeing Sam if she could compose herself and be reasonable, but that he (the doctor) feared that such a visit would make Sam violent as he had been on a former occasion. The letter then concludes:

''While in the room J. F. urged upon me to let him transfer all his property and money to me, fearing that Jennie might get possession of it and be foolish enough to spend it in giving it to lawyers in her determined effort to get Sam out of that place. I told Jake I did not want him to do this, but what I would like to have done is that the property he has and all his interests be conveyed to some Trust Company for the benefit of Sam and Jennie, so in the event of anything happening to him and to me, they would to a certain extent be taken care of.

''I wish you would think this matter over carefully and advise me what you think would be the best plan to adopt under the circumstances. I don't want the property conveyed to me, as Jennie would be sure to think I was trying to rob her of her interest.

''Hoping to see you in Chicago soon, I am,
     ''Yours very truly,     C. E. BLEYER.''

From the testimony of William H., it appears that he looked around St. Louis and not finding a desirable sanitarium there, he returned to Chicago on September 19th and there had a further talk with Charles E. with regard to the Hawley Company business, and in the talk he says Charles E. again referred to the property of Jennie and Jigo in St. Louis. That Charles E. there repeated to him what he had written in the letter of September 17th, which we have in substance stated above. That he told Charlie E. of the powers of attorney which he held, whereupon Charles E. asked if the $10,000 in cash to Jigo was included, and whether or not Jennie and Jigo could still sell or mortgage their real estate. That he informed Charles E. that the $10,000 was not included in the powers of attorney and that they could still sell or mortgage their real estate. That Charles E. said that it ought to be changed and asked him what were his views upon the subject. William H., as stated by him, then suggested that he had thought the matter over and talked it over with his folks, and before leaving St. Louis had discussed with the Mississippi Valley Trust Company about acting as trustee for Jennie and Jigo, but that they wanted to charge five per cent and that he suggested to Charles E. that they (Charles E. and William H.) act as cotrustees, whereupon Charles E. said that Jennie was hostile toward him and would not consent, but that he thought Jigo would consent. William H. then left for New York to see Jennie and Jigo, arriving there on the 23d. At this point some immaterial communications occurred between Charles E. and William H. On the 24th and 25th he says that, in conversations with Jennie and Jigo, he suggested to them the talks he had with Charles E. in Chicago as well as the contents of the letter of September 17th, supra; that Jennie at once said she would have nothing to do with Charles E.; that he told them that Sam's will

was drawn so as to make them (Charles E. and William H.) cotrustees for them and that they replied that they knew such to be the case, and Jigo said that his will was similarly made. From the details of these talks by William H. it further appears that Jennie objected to Charles E. because he had unloaded $10,000 of his debts upon the Hawley Company and that Jigo objected to the Mississippi Valley Trust Company for reasons of his own; that William H. suggested that the Trust Company wanted five per cent and that he would act for nothing and take more interest in their property. It also appears that Jennie accused Charles E. of failing to account for $5,000 insurance money coming to her from the estate of a deceased brother, and urged that William H. act as sole trustee; that to William H. acting as sole trustee Jigo objected because it would make Charles E. angry, and he had nothing against Charles E.; that Jennie was persistent in saying that Jigo turn over everything to William H., because, as she said, "The fool wanted to give his money and a deed to his lot to Charlie the other day," to which remark Jigo responded that, "It was his property and he would do what he damn pleased with it." After some further conversation, the deeds of September 26th and the deeds in dispute were drawn by William H. and as he says read to them and left with them for an hour and a half, whilst he got a notary to acknowledge them, which he did on his way back from the sanitarium, where he called upon Sam. That after the signing of the deeds Jigo indorsed his certificate of deposit for $10,000 in the Boatmen's Bank of St. Louis to William H. The consideration of $25 to each, William H. claims was paid then and there. The next day they took Sam to Chicago, he being accompanied by a physician and nurse, with the other three upon the train.

The plaintiffs, however, tell a different story. They claim that the certificate of deposit was given William H. prior to the time the deeds were executed and for the purpose of getting it renewed for another six months, and that William H. told them he had put it in a safety deposit box. They say that they executed these powers of attorney without reading them, trusting to William H.; that they, especially Jennie, were under the impression that their brother Sam was wrongfully confined and they were much interested in procuring his release; that William H. was pretending to be assisting them in this work; that when William H. brought the two papers (the two deeds in suit) he represented that they were powers of attorney, so that he could get money from the Hawley Down Draft Furnace Company to be used for Sam; that they having confidence in him, signed the same without knowing the actual purport or contents thereof; that they were anxious to have Sam released, and thought the money was to be obtained from the Hawley Company for that purpose on these last instruments; that they did not know the contents thereof for several months thereafter when they were informed by a lawyer. These parties likewise deny the alleged conversation detailed by William H. which led up to the deal, and deny that the deeds were left with them whilst the notary was being procured.

From Flushing, New York, the scene now shifts to Geneva, Wisconsin, eighty miles north of Chicago. Upon Sam's arrival in Chicago, as above detailed, he was placed in a sanatorium at Geneva. Thence followed Jennie and Jigo, and from that point the further acts occurred, which counsel for defendants contend corroborate the theory that these two deeds were knowingly and understandingly entered into by

219 Sup.—8

the parties.  William H. had returned to St. Louis
the evening upon which Sam and the party reached
Chicago, i. e., September 28th.  For the defendants
the story, from this point, thus runs:  On October 6th,
William H. returns to Chicago with copies of the two
deeds now in issue and shows them to Charles E.
and the latter was much displeased that he had not
been made cotrustee in the deed made by Jigo.  On the
7th he visited Jennie and Jigo, as well as Sam, at
Geneva, and on the next day returned to Chicago and
informed Charles E. that he was willing that they
be joint trustees in Jigo's deed if Jigo would con-
sent, but that he did not think Charles should be a
beneficiary in as much as he had unloaded some of
his debts upon the Hawley Company.  In the same
talk Charles suggested that he wanted to be made con-
servator of Sam's estate, so that he could vote the
stock and elect himself president and thus obtain the
$10,000 salary paid to that officer, whereupon William
H. suggested that, inasmuch as Sam's will provided
that both he and Charles E. be made joint trustees,
he thought they should be joint conservators, and that
with Jigo's consent they would both be made trustees
of his estate.  This is said to have been satisfactory
to William H. and Charles E. at the time, and William
H. returned to St. Louis.  At this point some corre-
spondence occurred between William H. and Charles
E. relative to the conservator of Sam's estate and
the joint trusteeship in Jigo's estate.  On October
18th, William H. again reached Chicago and took up
the matter with his uncle Charles E., who had filed
his application to be made sole conservator of Sam's
estate.  The interviews were not altogether friendly.
William H. urged that he, Jennie and Jigo were not
willing for Charles E. to be made sole conservator,
and Charles E. threatened to take steps to be made co-
trustee in Jigo's estate.  On October 21st, William H.
having on the 20th concluded his talks with Charles E.

proceeded to Geneva, and says he related the matters to Jennie and Jigo. At least, after a talk with them, he dictated and they wrote the following:

"Lake Geneva, Wis., October 21—04.

"We request and approve the appointment of William H. Bleyer as conservator of the estate of Samuel T. Bleyer. And we do not approve the appointment of Charles E. Bleyer as conservator of said estate.

"J. F. Bleyer,
"Jennie Bleyer."

"Lake Geneva, Wis., October 21—04.

"I hereby authorize William H. Bleyer whom I have heretofore constituted my trustee with full powers, to take the sum of one thousand dollars from the principal of my estate and pay the same over to me in twelve monthly payments of eighty-three ($83.33) 33-100 dollars each, commencing October, 1904.

"J. F. Bleyer,
"Jennie Bleyer."

In this same conversation, at which time these written instruments were dictated by William H. and written and signed by Jennie and Jigo, the matter of taking from the corpus of the trust fund the sum of one thousand dollars was mentioned by William H., as he says, that owing to the hostile attitude of Charles E. they would be unable to get any further sums for Sam through the Hawley Company. These two written instruments were shown to Charles E., but retained by Sam. Up to December 16th, it appears that $600 had been furnished by William H. to Jennie and Jigo—some $200 from the Hawley Company on account of Sam's salary, and there was some evidence that from July 26th to September 12th Jennie had also used $867.38, all of her deposit with the Mississippi Valley Trust Company. This closes the scene to

October 25th. On the next day Jennie telegraphed from Geneva to William H. at St. Louis, as follows:

"The Chicago fiend called yesterday. Jake asked if he aimed at his money. I shouldered it all. You were not mentioned. If asked, you positively know nothing decided on your side. Particulars by mail. Get the best of lawyers for November ninth. Heed my words. I have a terrible enemy to face."

She followed the same with this letter, which she on the stand admits, except as to the word "cur," and by experts that is shown to be hers:

"My dear Will: Telegraphed to you this morning, now I add to it that Jake asked the cur if he intended having his money or property. He nearly went in a fit saying it was a d—d lie, and he intended getting everything in his possession to look out for me and Jake. I did not say anything although I felt like laying him out. Vick was present. Your name was not mentioned. I to prevent it on Jake's part said the money is in safe keeping. He struck me against the wall saying —

"This is evidence in court to show who he is to be a man over me. Never say anything after this except to me, and by all means do not own up that you spoke about the money or else you said nothing. Provide good lawyers to assist you. He tries to keep me from going to the sanatorium. Am too nervous to write. With love,                    JENNIE."

November 6th, William H. again returned to Chicago and conferred with Charles E. and his attorney Judge Cratty. In that interview it was suggested, if Jennie and Jigo would not consent for Charles E. to be cotrustee in their deeds, that William H. withdraw entirely as to Jigo's property and let Charles E. be named in his place. This would have left William H. as trustee for Jennie and Charles E. for Jigo. It also appears that Charles E. offered to make Wil-

liam H. attorney for the Hawley Company at $100 per month if this could be done. Charles E., it is claimed, further said that he would be appointed con-servator of Sam's estate, notwithstanding the opposi-tion of the others. William H. claims to have re-fused this offer and proceeded to Geneva for a con-ference with Jennie and Jigo. In that conference and at the suggestion and dictation of William H. the fol-lowing were written by the parties:

"Lake Geneva, Wis., Nov. 8—04.
"Judge Thos. Cratty,
  "Chicago, Ill.
"Dear Judge Cratty:
  "We understand from Will to-day that Charley has retained a lawyer in St. Louis for the purpose of trying to have the trustee arrangements Jake and I made at Flushing on September 26th last, set aside. And he has no doubt consulted you in regard to the same.

"The object of this letter is to say to you that any such proceedings are entirely without our consent as we want matters to remain as they now are. We made Will our trustee because we believe he would properly look after our interests.

"JENNIE BLEYER.

"I have read and approved the foregoing letter.
                    "J. F. BLEYER."
        "Lake Geneva, Wis., Nov. 8, 1904.
"I have never at any time received money from the estate of my brother D. L. Bleyer, nor any in-surance money assigned to my sister Jennie and I, having relinquished my share to my sister Jennie Bleyer.                    J. F. BLEYER."

Upon the return of William H. to Chicago, follow-ing the advice of Jennie suit was brought against the

Hawley Company for the insurance alleged to have been collected by it as indicated in the letter last above quoted. William H. then returned to St. Louis, but returned to Geneva on November 22d. The next day the application of Charles E. to be made conservator was to be heard in Chicago. On the 22d William H. says he tried to quiet the feeling of Jennie toward Charles E., to the end that the family matter might be adjusted, and upon his return to Chicago the next day had the hearing postponed with that end in view. During all this time Jennie was telegraphing for money and money was sent to her, although William H. had told her that she ought to economize, as Sam's salary would soon be at an end.

On December 4th, William H. was again at Chicago, attempting to get all the parties together. This he attempted through an interview with Judge Cratty and Charles E. and they finally agreed upon a settlement, and William H. proceeded to Geneva to procure the consent of Jennie and Jigo. The terms of the settlement had not been reduced to writing in Chicago but William H. drew up two copies which he said covered the agreement, except that there was placed therein the sum of $250 per month for Sam's support, instead of $200 as agreed upon between him and Charles E. This instrument reads:

"*This Agreement* made this 6th day of December, 1904, witnesseth:

"First: The undersigned hereby consent and agree to the appointment of Charles E. Bleyer of conservator of the estate of Samuel T. Bleyer.

"Second: Charles E. Bleyer hereby agrees to personally expend for the use and benefit of Samuel T. Bleyer, in the manner from time to time determined upon by a majority of the undersigned, the sum of two hundred fifty dollars per month for and during the lifetime of said Samuel T. Bleyer, commencing January, 1905.

"Third:   Charles E. Bleyer hereby agrees upon signing hereof to execute and deliver to William H. Bleyer, trustee for Jennie Bleyer, for a consideration of one dollar a warranty deed to tract of land near Des Plaines, Illinois, containing about two hundred and fifty-five acres and improvements thereon, subject to the undivided interest of Samuel T. Bleyer therein, and subject to deed of trust for nine thousand dollars now existing.

"Fourth:   Charles E. Bleyer hereby agrees upon signing hereof, to execute and deliver to William H. Bleyer, trustee for Jigo F. Bleyer, for a consideration of one dollar a warranty deed to a tract of land in Forest Glen Subdivision, and improvements thereon, subject to deed of trust for twelve hundred fifty dollars now existing.

"Fifth:   The undersigned, Jennie Bleyer, Jigo F. Bleyer, William H. Bleyer, Adrien S. Bleyer, hereby assign, sell, transfer, release and quitclaim to Charles E. Bleyer any and all right, title and interest they now have, or at any time in the future may acquire, in the shares of capital stock of the Hawley Down Draft Furnace Company now owned by Samuel T. Bleyer.

"Sixth:   The undersigned hereby consent and agree to the terms and conditions of agreement made September 26, 1904, between Jennie Bleyer and William H. Bleyer, whereby the net income of the property therein described is to be paid to Jennie Bleyer during her natural life and said estate thereafter vesting absolutely in William H. Bleyer, Adrien S. Bleyer, Clifford M. Bleyer, Mildred M. Bleyer as therein provided.

"Seventh:   The undersigned hereby consent and agree to the terms and conditions of agreement made September 26, 1904, between Jigo F. Bleyer and William H. Bleyer, whereby the net income of the property therein described is to be paid to Jigo F. Bleyer

during his life and said estate thereafter vesting absolutely in William H. Bleyer, Adrien S. Bleyer, Clifford M. Bleyer, Mildred M. Bleyer, as therein provided.                          JIGO F. BLEYER (seal).''

He claims that Jennie first signed one of the two copies, but later tore off her name and the blank places for signature. Jigo signed the other copy as above set out, but before Jennie affixed her signature she wrote under Jigo's name the following and signed it:

''I consent and agree to the above provided Charles E. Bleyer permits me to have the entire care, custody and control of Samuel T. Bleyer and withdraws all claims on the person of S. T. Bleyer in having put in an asylum, or taken therefrom or removing to any place for the benefit of his health.

''JENNIE BLEYER.''

With this William H. returned to Chicago and Charles E. objected to paying $250 instead of $200 as first agreed and objected to the clause added by Jennie. William H. remained in Chicago, with the hope, as he says, of finally getting the parties together, and whilst there received from Jennie a telegram which had been forwarded to him from St. Louis. This telegram reads:

''Lake Geneva, Wis. Dec. 8—04.
''Wm. H. Bleyer,
    ''4451 Washington Ave.,
        ''St. Louis, Mo.
''I have drawn to-day three hundred dollars on the Mississippi Valley Trust through the 1st National Bank here. See that the money is deposited to spare yourself and me trouble. Sam warns you not to tie him up in any shape or manner by signature. Jake's signature holds no good. He does not know the nature of paper signed. You read it to me only, not to him.

C. E. Bleyer cannot be conservator without my signature. Have my legal advice here to-day.

"JENNIE."

December 21st the probate court of Chicago found Samuel T. to be insane, but made the Equitable Trust Company conservator of the estate instead of Charles E. Bleyer. January 17th the two suits now here for review were filed in the circuit court of the city of St. Louis. There are a number of flat contradictions in the evidence, some of which will be noted in the course of the opinion.

I. It is first contended by respondents that the petition fails to allege and charge a fiduciary relationship between the parties, and for that reason the burden to show fraud rests with these plaintiffs and did not shift, although the undisputed evidence shows at least a double fiduciary relationship between the grantors and the grantee prior to the deeds in dispute. The petition charges actual fraud. The proof not only tends to show actual fraud, but unequivocally shows this fiduciary relationship, which by some writers has been denominated constructive fraud. In support of this contention we are cited to 9 Ency. Pl. and Pr., 690, where the broad statement is made thus: "In an action for constructive fraud, arising out of the violation of the fiduciary relation, the plaintiff should allege the existence of such relation."

This announcement of the law purports to be based on the case of Feeney v. Howard, 79 Cal. 525, which to our mind lends but little countenance to the context of the text. We are also cited to Newham v. Kenton, 79 Mo. 382; Christian v. Ins. Co., 143 Mo. 469; and Cole v. Armour, 154 Mo. 351, neither of which discuss the exact question. The question before us is whether or not in a case where actual fraud is alleged and the proof tends to show the actual fraud,

and also shows a fiduciary relationship, then it is incumbent upon the person who is made the grantee in written instruments, to show the utmost fairness thereof. In this transaction the defendant William H. Bleyer, his daughter and his brother get three-fourths of the estates in remainder.

This is a very nice question for discussion, but one purely academic in this case, because, even if the burden to show fraud was upon plaintiffs, they have successfully carried it, as will appear in the succeeding paragraph where we discuss the evidence. The evidence of a fiduciary relationship was admitted without objection, and was properly admitted. It could be shown on the general allegation of fraud, but as to whether such showing made it incumbent upon the defendants to assume the burden of showing utmost fairness we do not discuss, because unnecessary in this case.

II. On the merits of this case, whilst we have the utmost regard for the learned chancellor who passed upon it *nisi,* we cannot agree to the conclusions reached. We concede with him that the evidence is conflicting. We concede with him that there are things testified to by the plaintiffs that are not strictly in accord with what we think was done in the transactions which transpired between these parties. Signatures are denied, when they should not have been denied. Other things are denied when they should not have been denied. But after all, it is for a court of chancery to take the whole case, and upon it administer what is right. Eliminating the question of the burden of proof, and whether it was shifted by the proof that there was fiduciary relationship, let us consider for the moment the case presented. That there was proof of a fiduciary relationship between the plaintiffs and the defendant, William H. Bleyer, cannot be denied. That this relationship was not

pleaded cannot be denied. But for the present purpose concede that status, and what have we? Jigo Bleyer had been an invalid, suffering from locomotor ataxia for years. Jennie Bleyer was an old lady of sixty-two years. Both had been looked after and cared for by their brother Sam. No business cares had been cast upon them. They trusted in him as does the child in the parent. Suddenly misfortune overcomes the staff of their lives. The word comes that the greatest of all afflictions has overcome Samuel T. Bleyer; that the mind·which had guided, directed and supported these two plaintiffs had flown. In their extremity they call upon William H. Bleyer. To them, Charles E. Bleyer had not been faithful, or at least they so thought.

William H. Bleyer had counseled with them upon other matters, and why not upon this? That Jennie Bleyer was wrought up over the condition of Sam, her brother, is breathed in every line of the testimony. That she, whether rightfully or wrongfully, conceived that her brother Sam, the staff and stay of her life, was wrongfully detained of his liberty, is equally apparent. In this distress she telegraphed William H. to come to New York. He had hardly landed until he suggested powers of attorney as to their property interest in St. Louis. Counsel for plaintiff seem to concede that these two instruments were understood by the parties. In fact counsel for plaintiffs urge nothing against these instruments. That they were secured upon the suggestion of William H. Bleyer there can be no question. We are also of opinion that the wording of the instruments has more significance than would appear at first blush. In these very instruments it is provided that the attorney in fact can "convey in trust or otherwise dispose of" the property in question. To our mind, the words are significant, especially the words, "convey in trust." They become more significant when considered

with the attendant circumstances. Here we have William H. and Charles E. discussing the situation of these two people whilst *en route* to New York, and immediately these peculiarly worded instruments as procured by William H. Had he meant to merely mortgage the property for security or otherwise, it is not likely to have been couched in this peculiar language. It becomes more evident that there was a purpose in the mind of William H. when he drew the instruments to hold the right to convey the properties "in trust," in the true sense of the term, when we see and read what occurred afterward. At every corner there seems to appear a disposition of William H. and Charles E. to have the corpus of the estates held by these two decrepit people (we said decrepit, for one was aged and the other an invalid, and both inexperienced) intact for the survivors in blood. William H. and Charles E. seemed exceedingly anxious to hold these estates as well as that of Samuel T. jointly as trustees. In fact William H. seems to have been as much or more interested in that than in pressing the claim of Jennie and Jigo for the liberation of Sam. This record cannot be read without this conclusion. When diplomacy failed to get him and Charles E. together, threatened litigation was used, and this through the malleable minds of Jennie and Jigo, over whom William H. appeared to have absolute control.

These were met by counter threats upon the part of Charles E. The plans finally failed, but not especially on account of the willingness of William H. for them to fail. He was willing that Charles E. act jointly with him throughout the three estates. The objections on the one side came from the enfeebled minds of the plaintiffs as to some things, and from the master mind of Charles E. as to others. Throughout all, William H. was anxious for joint instruments in all the estates. At the time he was the agent and counsel of the plaintiffs. To our mind there is one

thread running through this transaction. This thread had its beginning in the conversation between William H. and Charles E. whilst *en route* to New York, where William H. was going in response to the message of distress previously sent by Jennie. From that time on every effort seems to have been to get these two estates, as well as their interests in their brother's estate, beyond the control of the plaintiffs and under the absolute control of William H. and Charles E. and this no doubt would have been accomplished, but for the matters hereinabove detailed. The very deeds in issue were the results of the joint suggestions of William H. and Charles E., although not in strict accord with the ideas of Charles E., for in common parlance he demanded a "finger in the pie." To our mind it appears that for William H. to have made a "conveyance in trust" so soon after the powers of attorney authorizing such would have lent color to fraud, and he and Charles E. so thought and for that reason the last deeds were secured, and secured at a time whilst William H. was leading plaintiffs to believe that he was, in good faith, assisting them in trying to liberate Samuel T. Bleyer. Another fact should not be overlooked. From the record it appears that whilst in proper mental vigor Samuel T. Bleyer was a strong, successful business man. It also appears that he realized the frailties of the plaintiffs. That he kept them with him and managed their affairs. That he provided for their future by a proper will upon his demise. Of course this will could not reach the property in plaintiffs' names, but only that which he was leaving to them, but it clearly indicates his idea of their inability to attend to business. This, however, does not warrant William H. or Charles E. to undertake to reduce the two estates in question to the same status of the one provided for by will. If these parties are incompetent under the law to handle their property, the law provides a method of

changing it, without deeds. We do not believe these instruments were understandingly entered into by the plaintiffs. We believe that they were imposed upon by William H. Bleyer, he knowing the confidence they reposed in him. We have read and reread this record. Each reading has more thoroughly convinced us that the learned chancellor *nisi,* was in error. The decrees should be reversed with directions to enter decrees as prayed for by the plaintiffs in their petitions. It is so ordered.

All concur.