Louis E. Trieseler, Administrator of the Estate of Bert P. Bebee (also known as Bert P. Beebe), Deceased, (Plaintiff) Appellant, v. Mitzi Laun Helmbacher (formerly Mitzi Laun; also known as Mitzi Bebee, Mitzi Schmid and Amelia Schmid), Kate Schmid, Frederick M. Schmid (also known as Fred Schmid), and Chippewa Trust Company, a Corporation (Defendants), Respondents.—No. 38134.—168 S. W. (2d) 1030.

Division One, March 2, 1943.

808

*Watts & Gentry* and *Henry G. Trieseler* for appellant.

*B. Sherman Landau* for respondent Mitzi Laun Helmbacher; *Noah Weinstein* for respondents Kate Schmid and Frederick N. Schmid.

 VAN OSDOL, C.—This is a suit for an accounting. The petition, filed September 9, 1939, declares on the theory of a constructive trust, alleging a conspiracy to defraud, whereby defendants, other than the defendant, Chippewa Trust Company, by means of false promise, induced plaintiff's decedent to turn over to them sums of money totaling an amount in excess of $170,000. It is alleged that the money was placed and is kept in one or more safety boxes rented of the defendant, Chippewa Trust Company, St. Louis, Missouri. The petition prayed, and the court granted, a temporary order restraining the defendants from disturbing, or permitting to be disturbed, any money in the boxes. Defendants, except Chippewa Trust Company, plead the statute of limitations and specifically traverse the several material allegations of the petition. The defendant, Chippewa Trust Company, did not answer. On the trial of the cause the court dissolved the temporary injunction, found for defendants and dismissed the bill.

██ Respondents have moved to dismiss the appeal for the reason, they state, appellant has not complied with Rule 13 of this court, in that appellant has failed to set forth in the abstract of the record sufficient of the record as is necessary to a complete understanding of all the questions presented for a decision, that the abstracting of the testimony is narrative in form, that the narration is not aligned with a fair construction of the testimony, and that the narration does not indicate that certain witnesses testified to the contrary elsewhere in their testimony. Respondents have set forth in their printed argument parts of the testimony purporting to have been taken from the bill of exceptions as examples of the appellant's alleged failure to comply with the rule. Respondents also urge their cause on the merits by reference, in part, not to the abstract of the record, but to the portions of testimony so set out in their argument. We have carefully examined the abstract of the record and find that the presentation of the evidence is almost entirely in narrative form and believe that it would have been better had testimony of certain witnesses been set forth in question and answer form—for a decision in this case depends greatly on the credibility of witnesses. However, we believe the abstract of the record is not so faulty in this regard as to merit such drastic action as dismissal of the appeal. Since the abstract of the record is not so faulty as to merit dismissal of the appeal, it was the

respondents' duty to file an additional abstract of the record if not satisfied with appellant's, and especially if it was their intention to urge on the merits matters not included in appellant's abstract of the record. They should not have referred in their printed argument to testimony transcribed in the bill of exceptions, and not included in any abstract of the record, for the bill of exceptions is not before this court.

The motion to dismiss the appeal is overruled.

Plaintiff, appellant, is the duly qualified administrator of the estate of Bert P. Bebee, sometimes Beebe, who died of a gunshot wound suffered at his office at 3214 South Grand Avenue, St. Louis, Missouri, on April 22, 1938. Bebee was a physician and had practiced in St. Louis, Missouri, for about twenty-five years. The defendant, Mitzi Laun, had been the wife of Dr. Bebee; they were divorced in October, 1932; since the trial, she has married one Helmbacher. Katie Schmid is the mother of Mitzi Laun, and the defendant, Fred Schmid (Frederick M. Schmid), is the husband of Katie Schmid, but the step-father of Mitzi Laun. Notwithstanding the divorce, the doctor continued to reside at the home of the Schmids, except for short intervals, until February, 1938; the four were on very amicable terms; Dr. Bebee, according to two witnesses, sisters of Katie Schmid, was fond of Katie Schmid, whom he invariably addressed as "mother"; he said she was the "best mother he ever had" and that the "Schmid home was the best home he ever had." Mitzi Laun was a nurse and served Dr. Bebee at his offices as assistant from March, 1933.

Dr. Bebee's practice was not in harmony with the high ethical standards of his profession. It was covert—perhaps unlawful, for he had two indictments pending against him in 1938, charging him with the crime of manslaughter by abortion, and there was, the same year, a proceeding pending to revoke his license as a physician.

The Collector of United States Internal Revenue was interested in the doctor's affairs; assessed penalties and taxes against him for about $11,000, for the years 1929 to 1935 inclusive, afterwards tentatively compromised for $5,000, which was paid by Dr. Bebee in early 1938, refunded by the collector to the estate after the death of Bebee, and another compromise effected thereafter by the administrator, plaintiff herein, in the sum of $2,706, which sum has been allowed as a claim by the probate court, but was unpaid at the time of the trial.

Dr. Bebee kept a record of his practice and earnings in a "year book," one book for each year; the entries were in secret symbols. The year book for 1938 was not at his desk at the time of his death and no books of prior years were in evidence; one or more of them, it seems, were in the hands of the Federal authorities. It appears that Dr. Bebee carried a bank account at the Tower Grove Bank and Trust Company. He rented a safety box, No. 1754, of that bank in 1928 and continued the use of it until 1935. The box was visited twenty-two times in 1932; twenty-six times in 1933; fifteen times in 1934,

the last visit in said year being *September 10 at three o'clock*; once in 1935, *July 12th at one o'clock*, on which date the records of the bank show "Box found empty Surrendered by Palmer Branham." The bank has a memorandum of surrender of the box signed by Dr. Bebee of date July 11, 1935.

Defendant Katie Schmid rented safety deposit box No. 2122 at the Mississippi Valley Trust Company on August 20, 1934; on *September 14, 1934,* she exchanged this box for safe No. 5905, a larger box. Mitzi Laun and Fred Schmid had authority to visit the box. It was surrendered August 13, 1937. On August 13, 1937, Katie Schmid rented safety box No. 2026 of the Chippewa Trust Company under the name of "Augusta Humer," Mitzi Laun had authority to visit this box, but it was visited only by defendant, Katie Schmid (Augusta Humer), so far as bank's records show, on August 18, 1938; September 9, 1938; October 6, 1938; November 30, 1938; once, date not known; and on January 20, 1939, on which date its use was surrendered.

Mitzi Laun rented safety deposit box No. 2093 at Mississippi Valley Trust Company on February 27, 1929, as Mrs. Mitzi Bebee, and renewed her contract of rental on *September 14, 1934,* as Mitzi Laun. Katie Schmid and Fred Schmid both had authority to visit this box. Its use was surrendered January 26, 1937. No evidence was introduced of visits to this box.

Dr. Bebee was not a well man. He was admitted to Alexian Brothers Hospital for examination August 22, 1934, discharged August 24, 1934, admitted for treatment September 19, 1934, discharged October 13, 1934; diagnosis—tabo paresis. It was the testimony of Dr. Hillel Unterberg, distinguished neurologist, who treated Dr. Bebee at the hospital, that he suffered from syphilis of the nervous system—tabes paresis—that is, softening of the brain and locomotor ataxia, that he could hardly walk at all, had definitely deteriorated mentally, talked very little, showing no initiative in conversation. Dr. Unterberg stated that this condition was one of gradual development, that Dr. Bebee had been afflicted for many months, probably many years; such a patient thinks slowly, his judgment is impaired, and his emotional state becomes shallow with poor reasoning ability and slow reactions. In Dr. Unterberg's opinion Dr. Bebee was of unsound mind at the time he saw him and had been so "for quite sometime."

The physical incapacity of Dr. Bebee necessitated his reliance upon others to attend to his personal and physical requirements, which were often most repulsive. For these services he relied on the defendants, Katie Schmid and Fred Schmid, and on his personal attendant, Palmer Branham. Branham accompanied Dr. Bebee on trips, acted as his chauffeur, assisted him in walking and, on occasions, Dr. Bebee was borne up the stairway to his office on Branham's back. At home, Katie and Fred Schmid attended to his personal and physical needs,

administering medicines, and Katie Schmid also catered to Dr. Bebee's inordinate appetite for delicacies.

Dr. Bebee, plaintiff's witnesses testify, had purchased the home in which he and the Schmids lived and had bought a tract of land in the Ozarks for the sum of $3,000. The title to both these properties apparently is in the Schmids. He owned a summer cottage in Crystal Lake, south of Clayton, in St. Louis County, where he employed a Mr. and Mrs. Hansen as helpers and caretakers. In 1936 Dr. Bebee owned a Lincoln Zephyr automobile, Fred Schmid owned one, and so did Palmer Branham. He visited Hot Springs, Arkansas, in 1938, and made a trip by air to California in March, 1936; in both instances Branham accompanied him.

The petition alleges, in substance, that the mind of Dr. Bebee was so weakened by his afflictions that he was susceptible to the influence of the defendants (Chippewa Trust Company is not included here nor hereinafter when the word "defendants" is used), who were living in close association with him, and that the defendants "taking advantage of their relations with the said deceased, shortly before he died, entered into a conspiracy by which they all agreed and undertook to get away from the said deceased, large sums of money, including the money which he had in the safety deposit box above mentioned, by making to him false and fraudulent representations to the effect that it was dangerous for him to have such large sums of money under his control, that people were liable to get it away from him and that the United States Government would be likely to seize it in order to collect income taxes which he had not paid and returns for which he had not properly made, intending by such representations to secure all of the money belonging to said Beebe on the promise to hold the same for his use and benefit and to deliver to him or pay it out on his order as needed, but with the secret intention of permanently keeping all of said money." The petition further alleges the insolvency of defendants, that plaintiff has no adequate remedy at law, and prays for an accounting.

Plaintiff offers as principal witness (George) Palmer Branham (the personal attendant of Dr. Bebee), who testified: that from the time Mitzi Laun entered the employ of Dr. Bebee in 1933, until September, 1934, witness overheard her, on a number of occasions, talk to Dr. Bebee with reference to his money. She told Dr. Bebee often that he was going to get into trouble with it, that the Government would take it over and would send him to the penitentiary for having the money that he had put away. Witness often heard the three defendants during the same period tell Dr. Bebee "if he didn't put his money where it was safe he would get into trouble like Capone"; they wanted him to let them keep it so they would have it if he needed it. Witness also heard Mitzi Laun urge the doctor to let her have the money in order to keep one Boots Kennedy from having it. Boots

Kennedy frequently solicited Dr. Bebee to invest money in a patent. Dr. Bebee, according to witness, was "very lenient" with Kennedy and often gave him money for his business.

On *September 11, 1934,* witness drove Dr. Bebee to the Tower Grove Bank and Trust Company, where a custodian gave Dr. Bebee his safety deposit box. Dr. Bebee and witness went into a double booth. This was the only time witness had ever entered the booth with the doctor. Dr. Bebee opened the box, and put its contents on the shelf of the booth. The contents consisted of $170,000 "in greenbacks"— nothing else was in the box. The bills were in denominations of hundreds, fifties, twenties, tens and a few fives, Dr. Bebee counted it and witness counted it, "he counted a thousand dollars and what he counted I would check, and ▮▮▮▮ he would check what I counted so we knew what was there." They were in the booth from 1:30 to 2:00 o'clock until 4:00. Dr. Bebee put the money in a small black bag. It was a "little old-fashioned physician's bag." Witness took charge of the bag and they went to the Schmid home. Witness put the bag, at Dr. Bebee's direction, in the closet of the doctor's bedroom. Two days later at about 9:30 in the morning witness was at the Schmid home, Dr. Bebee asked Mitzi Laun "what bank she wanted to put the money in" and she said, "Mississippi Valley." Dr. Bebee said, "Come on let's get going and take the money." Miss Laun did not take the little black bag, but had a new black and white checked bag with a zipper. Witness did not "look in it," and witness did not see the small black bag then. Katie Schmid and Miss Laun went in one automobile, and Dr. Bebee and witness followed in another, to the Mississippi Valley Trust Company where Katie Schmid and Miss Laun entered the bank with the bag.

Witness testified that Dr. Bebee saved up his money in what he called his "grouch bag." This was a zipper pocket in his bathrobe, and in May, 1935, he had $15,000 in it. He gave the money to Mitzi Laun telling her to put it with the rest of his money. In March, 1936, Dr. Bebee and witness went by aeroplane to California. The doctor had $10,000 in a black bag, which witness carried. Upon return from California $8,500 remained, which the doctor gave to Mrs. Schmid who had met them at the airport.

Christmas in 1936, Dr. Bebee brought $6,000 to the home of the witness which he had gotten at his summer cottage at Crystal Lake. The money was taken to the Schmid home and given to Katie Schmid. The doctor said to her, "Just put this with the rest of my money." Later witness went to the cottage and got $3,280 from between the mattresses of Dr. Bebee's bed. This money was taken by the doctor and witness on their visit to Hot Springs, Arkansas, in February, 1938. Katie Schmid came to Hot Springs and, upon her warning that the money was not safe at the office of the hotel, Dr. Bebee gave it to her.

Dr. Bebee gave $1,800 to Miss Laun early in February, 1938. He said to Miss Laun, "Just keep it for me and put it with the rest of my money." Witness states, "I asked him at the time why he gave her the money and he said he gave it to her because he was going to need it for this trouble."

When the doctor was indicted late in 1937 or early in 1938, he asked Katie Schmid for some money. He needed it to employ counsel and provide bondsmen, he had had other litigation; Katie Schmid told him she would give him what was left; Dr. Bebee wanted to know what was left, to which she replied, "about $6,000." Dr. Bebee said he knew there was more than that. A little after February 10, 1938, Dr. Bebee, Miss Laun, Katie Schmid and witness went to the Chippewa Trust Company where Katie Schmid and Miss Laun went into the bank; returning, Miss Laun gave a package of money to the doctor. Upon their return to the office Dr. Bebee and witness counted the money and found the amount to be $4,960, whereupon Dr. Bebee called Mitzi Laun on the telephone and the witness recounts as follows:

". . . he said: 'There is no $6,000.00 here.' She said: 'There isn't? How much is there?' He said: 'There is $4,960.00.' 'Well,' she says, 'There was $775.00 left in the bank, but I wouldn't give it to you because you wouldn't tell me what you were going to do with it.' He just hung up."

Witness states that he was present with Dr. Bebee at the home of Henry G. Trieseler, an attorney, in November, 1937, when Dr. Bebee consulted Mr. Trieseler concerning the recovery of moneys of the defendants. Witness received $50 per week for his services. Witness states the doctor owed him eleven weeks' salary on April 22, 1938, and that after the doctor was wounded and before he was taken to hospital he gave witness $65, which was all the "assets" remaining.

There was received in evidence a document signed by four of the five heirs at law of Dr. Bebee and signed "Accepted Palmer Branham":

"We the undersigned, Lucille May Keller, Berta Knox, Lester Beebe, and Allen Beebe, heirs of Bert P. Beebe also known as Bert P. Bebee, have heretofore, on April 26, 1938, agreed that Palmer Branham for his services in aiding us in the recovery of the money and property of the late Bert P. Beebe shall share in the net distribution equally with each of us and such amount shall be paid to him by the Administrator of the Estate of Bert P. Beebe, deceased, for each of us.

"Dated at Santa Monica, California this 5 day of July 1938"

Witness Branham wrote a letter to two of the heirs at law of Dr. Bebee on August 3, 1938, parts of which are as follows:

"I received your last letters the same day with about the same questions and all of one interest of course I not being able to ans. the *battry* of questions intelligently, I am having same answered from Hy's office from where all information will have to come from.

there are *two* many interested in this affair to do other than act accordingly to *Hoil*. How ever all of your answers are in today's mail and I do hope will meet with the approval of all concerned. On this end Hy. & I are doing all possibly that can be done. I hope you all appreciate that it takes time to do anything. Also try not to lose sight of the fact that if it were not for my foresight six years ago the California Bebees would not have anything to look forward *too* at this time. I don't say that with any ego I am merely stating the truth.

"Now Folks just take stock of all of us Me, you—all everybody concerned and just remember we are all in there playing ball against a Quarter of a Million Dollars as I have explained many times I know how much it is, where it is, and we are going to get it but it has not arrived as yet." (Witness states that "Hy," mentioned in the letter, is Henry G. Trieseler).

Henry G. Trieseler, an attorney, and brother of the plaintiff administrator, testified as follows: That he was consulted by Dr. Bebee at his home on the Tuesday before Thanksgiving in 1937. At this consultation Palmer Branham was present and, according to the witness, Dr. Bebee detailed to witness facts which agreed with the testimony of Branham, hereinbefore reviewed, with additional statements that another and further sum of $7,500 had been turned over to defendants; that Dr. Bebee had gotten the $5,000 to pay to the Collector of Internal Revenue from Mitzi Laun; and that Dr. Bebee stated he had purchased the Schmid home and had bought a tract of land for the Schmids at Malibu Beach on the Lake of the Ozarks. It was a difficult thing to get the story out of Dr. Bebee, "I would ask him a question, and he wouldn't answer it or he wanted to talk about something else. I would have to bring him back to it all the time." The doctor concluded the conference, according to the witness, by stating that the total amount he had turned over to defendants, including the two investments in real property, amounted to $226,000.

Witness had known Dr. Bebee since 1920 or 1921, and between those years and 1929, had examined titles of land on which Dr. Bebee had mortgages securing the payment of about $85,000; witness advised Dr. Bebee to sell the paper and, when witness saw the doctor in 1930, witness asked him, "You got back all your $85,000?" and the doctor answered, "Oh, there was much more than that." Brother of witness, Louis E. Trieseler, plaintiff, represented Dr. Bebee as counsel in the income tax matter in the beginning and another attorney finished it, and, according to witness, yet another attorney was employed by Dr. Bebee to defend in the criminal causes. Bebee and Branham conferred with the witness again in February, 1938, the time being just after the two indictments had been returned. Witness states the doctor directed that no suit against defendants be brought because of the indictments and until his compromise went through with the government. Witness has a contract for 50% of

the distrbutive share of four of the five heirs at law of Dr. Bebee contingent upon recovery herein.

It was the testimony of Louis E. Trieseler, plaintiff, an attorney, that he wrote a will for Dr. Bebee in *1934*. In the will the amount given to the doctor's kindred was small and the residuary legatee was either Mitzi Laun or Katie Schmid. After the doctor's death, a thorough search of the doctor's office and room was made, according to the witness, and no will was found.

Testimony of Oliver J. Hansen, caretaker of the Crystal Lake summer cottage, corroborates that of Branham relative to money found by Branham between the mattresses of the bed of Dr. Bebee, but the witness does not know the amount.

Mr. and Mrs. Charles R. Porter testified of a conversation in the spring or early summer of 1936, in which Katie Schmid, petulant that Dr. Bebee had gone to live at the cottage, said, ". . . I think he has left entirely; I think he is going to get an apartment, but I'll fix him, I won't give him his money back." Mrs. Porter is not friendly to defendants.

Defendants' testimony was proffered but excluded by the court upon plaintiff's objection that defendants are disqualified by statute.

Mrs. Jackson and Mrs. Swaby, sisters of Katie Schmid, testified of the uniformly pleasant relations which existed between Dr. Bebee and the Schmids which, according to these witnesses, existed until the doctor's death.

Witness Lester Briggs testified that Palmer Branham told him he was suing Mitzi Laun and asked witness if he would testify for him, although witness knew nothing about the case. This, Palmer Branham, recalled, denied.

The first semiannual statement of the administrator in the probate court shows total assets of the estate of Dr. Bebee to have been $7,834.93. The second semiannual settlement shows balance in the hands of the administrator, $1,212.05. Of the disbursements, Henry G. Trieseler, witness herein, had been allowed and paid $4,500 as attorney's fees.

No witness testifies of payment of moneys made by Dr. Bebee to defendants at a time so remote as five years before the suit was commenced—plaintiff's cause of action then is not barred by the statute of limitations.

█ It is against equity and good conscience that a person who has acquired property of another through fraud should be permitted to retain it, for so to do would enable him to be unjustly enriched and the other unjustly deprived of the property. Restatement, Restitution, sec. 160; Kerber v. Rowe, 348 Mo. 1125, 156 S. W. 2d 925. However, not all who are deprived of property unjustly may avail of the procedural remedies of a court of equity. In cases where a person has been unjustly deprived of ordinary personalty, or money, for which a money judgment is a remedy, the person so deprived must

resort to a court of law; save where there is an element of fact which makes a remedy at law, by which a money judgment may be had, inadequate as, for example, the insolvency of the wrong doer (herein pleaded, but not proven), State ex rel. Nute v. Bruce, 334 Mo. 1107, 70 S. W. 2d 854, or where (as herein alleged) the deprivation was procured through the abuse of a relation of which a court of equity takes cognizance, such as fiduciary or confidential one. Restatement, Restitution, sec. 160, p. 645. So the pleading and proof of a fiduciary or confidential relation in this case is necessary in order that a remedy in a court of equity may be invoked, for, absent the pleading and proof of such a relation, the property involved being money, the plaintiff would be relegated to his remedy at law.

A confidential or fiduciary relation exists where two persons stand in such a relation as that, while it continues, confidence is necessarily reposed by the one and the influence which naturally grows out of that confidence is possessed by the other. Martin v. Baker, 135 Mo. 495, 36 S. W. 369. As was stated by the court in Studybaker v. Cofield, 159 Mo. 596, 61 S. W. 246, ''There are certain technical relations that are readily comprehended as fiduciary, such as guardian and ward, attorney and client, priest and communicant, etc.; but there are other relations not falling in either of those specified classes that are in fact fiduciary, . . . It is in each case a question of fact. The law regards the real, rather than the nominal, condition.'' See also Liddell et ux. v. Lee (Mo.), 159 S. W. 2d 769, and Selle v. Wrigley, 233 Mo. App. 43, 116 S. W. 2d 217. The origin of the confidence and the source of the influence are immaterial. Judd v. Walker, 215 Mo. 312, 114 S. W. 979; Liddell et ux. v. Lee, supra.

Now, if the defendants, because of their friendly association with Dr. Bebee, and through the necessitousness of their care for him were in such a relation to him that confidence was reposed in them by him and if they, conspiring together, abused such confidence and made a false promise to him by which they intended to procure and did procure money of him, then they, in equity and in good conscience, should have rendered a strict account to him, or now, should be required to render a strict account to his estate.

On the question of whether or not a fiduciary relation existed between Dr. Bebee and defendants: the defendant, Mitzi Laun, who had borne the relation of wife to Dr. Bebee, had not, though divorced from him, ceased her amicable relation with him, and it is significant that within a few months after the divorce she became his helper, associate and assistant, as a nurse, in his practice. The defendant, Katie Schmid, cared for Dr. Bebee as if he were a baby, administered medicines to him, and prepared and cooked delicate foods for him; Bebee was devoted to her as if he were her son and grateful for the home he and the Schmids shared. The defendant, Fred Schmid, likewise it seems, served Dr. Bebee in attending to his physical requirements, giving him medicines and in assisting him in moving

about the Schmid ▮▮▮ home; if these ministrations were done in a spirit of patience, kindliness and sympathy, as they apparently were, it would be difficult to conceive of a relation which would be more conducive of inspiring a feeling of trust and confidence in the one for the others, especially when the grave helplessness of Dr. Bebee and his consequent dependence on the others to assist him is considered.

As to the conspiracy: circumstances of the case, such as rental of safety deposit boxes by the defendants with the authority in the other defendants to enter and visit the box rented by a particular defendant, are, it seems to us, if money was procured of Dr. Bebee and if fraud is shown in any defendant in its procurement, sufficient from which it may be inferred that acts of one in the consumption of the fraud were in the joint assent of all of them.

Of the proof of the alleged false promise: the plaintiff urges that the defendants "having failed to meet the charges leveled at them by the petition and the evidence offered by plaintiff *by any evidence in contradiction thereof,* have accordingly failed to meet the rule as to the burden of proof imposed upon them as such trustees and fiduciaries of the deceased and the record being void of any evidence in support of their defense, the case must be decided on the evidence offered by plaintiff." That "*the burden of proof shifted* to the individual defendants to overcome the prima facie case made by plaintiff and establish their defense by the greater weight of the evidence in their favor." (Italics ours.)

Does proof of confidential relations between the parties and evidence tending to show the actual fraud pleaded cast upon the defendants the burden of showing that the entire transaction was of the utmost fairness? See Bleyer v. Bleyer, 219 Mo. 99, 117 S. W. 709, where the question is stated but not decided.

The plaintiff alleges actual fraud in the deprivation of money; that defendants procured money of plaintiff's decedent "on the promise to hold the same for his use and benefit and deliver to him or pay out on his order as needed, but with the secret intention of permanently keeping all of said money." The existence of this alleged false promise is the gist of the plaintiff's case and an evidentiary showing of the false promise is necessary in order that the plaintiff may establish that which, under the pleadings, is essential to his relief—a constructive trust. Ferguson v. Robinson, 258 Mo. 113, 167 S. W. 447.

"On the position of the burden of proof, properly so called, the existence of any particular inference of fact can have no effect, even should it constitute a prima facie case, or should further proof be excused by a rule of law." 31 C. J. S., Evidence, sec. 111. See also McCloskey v. Koplar, 329 Mo. 527, 46 S. W. 2d 557.

The burden of proof, as distinguished from the burden of going forward with the evidence, remains with the plaintiff herein through-

out the case. Testimony of plaintiff's witnesses, substantially tending as it does to show that money was procured by the false promise pleaded, makes a prima facie case which the defendants could offer evidence to rebut, that is, the burden of going forward with the evidence after the making of the prima facie case by the plaintiff is on the defendants. The evidence introduced by defendants does not substantially contradict the evidence of plaintiff. But the plaintiff's case rests in part on oral testimony, the weight and value of which (and the credibility of the witnesses who gave such testimony) is judged, and the inferences therefrom are determined by the trier of the fact; plaintiff continues to bear the burden of proof; the risk of nonpersuasion; the burden of convincing the trier of the fact, here the chancellor.

The plaintiff relies upon the testimony of Palmer Branham and Henry G. Trieseler to prove the making of the false promise; considering the evidence, aside from the testimony of Palmer Branham and Henry G. Trieseler in that connection: circumstances indicate that Dr. Bebee made some change in the manner of the possession of his money on or about September 10, 1934; this may be inferred from the visit to his box No. 1754 at the Tower Grove Bank and Trust Company of that date, no visits to the box thereafter until its surrender September 12, 1935, although the box had been visited numerous times in prior years. The facts indicate that the defendants may have received money soon after September 10, 1934; this because of the renting of a larger box by Katie Schmid on September 14, 1934, at the ▆▆▆ Mississippi Valley Trust Company, and by the renewal contract made by Mitzi Laun of box No. 2093 on the same day at the same bank. The subsequent renting of a box by Katie Schmid at the Chippewa Trust Company under the name of "Augusta Humer" may or may not be significant on the issue here, but it was not a place of concealment of money from Dr. Bebee for, according to Branham, Dr. Bebee accompanied Katie Schmid and Mitzi Laun to this bank when the payment of $4,960 was made to him in February, 1938.

Shall we assume that Dr. Bebee did turn over money in some amount to the defendants: was it under circumstances as would constitute the defendants trustees as alleged? Or was there a gift qualified to the repayment to Bebee of such of it as he should require; or did he entrust it to them, without the inducement of the fraud pleaded, to keep it safely for him and pay it out to him as he should require? These latter possibilities are all in harmony with the facts in evidence, if such facts are viewed aside from the testimony of Branham and Trieseler.

Considerations of the services the defendants had performed for him, of the kindnesses shown him by them, may have prompted Bebee to be disposed to wish the defendants to have that of his money remain-

ing in the event of his death—he had made a will in 1934, by which it appears that such was his disposition.

Dr. Bebee did make and have large sums of money in his time. Undoubtedly so, for he spent so much. He maintained a home at the Schmid's, a summer cottage at Crystal Lake with caretakers, an office with nurse assistant; employed a well-paid personal attendant; possessed an automobile and probably maintained three; journeyed to California by air, accompanied by his personal attendant; visited Hot Springs, Arkansas, with attendant; we may infer that he, though a doctor, incurred large expense in medicines and medical treatment, we know he paid for hospitalization; he was beset with litigation, paid out $4,960, or more, in counsel fees and for bail in connection with indictments for manslaughter, and in counsel fees in the proceeding to revoke his certificate of license as a physician; he had had other litigation; he was very "lenient" with one Kennedy, often giving him money for his business; he paid out $5,000 to the collector of revenue; and, we may assume, he had other extraordinary expense which would attend one so the victim of his disease.

We cannot assume that because of his physical and mental impairment, his slowness in mental, and shallowness in emotional, reaction, his tardy reasoning ability and his lack of initiative in conversation, that Dr. Bebee was utterly devoid of recollections—the evidence does not show this. It is noted that, according to Branham, Dr. Beebe was not hostile, not unduly surprised, and made no serious remonstrance, when told by Katie Schmid in the early part of 1938, that there was "about $6,000" left. It is improbable that Dr. Bebee would have paid Mitzi Laun $1,800 in early 1938 with the explanation, as Branham stated, that he "gave it to her because he was going to need it for this trouble" had the defendants theretofore fraudulently deprived him of the large sums of money alleged by plaintiff.

Of the degree of proof required to establish a constructive trust:

"A preponderance of the evidence is not sufficient; the evidence must be so 'unquestionable in its character,' clear, cogent and convincing 'as to exclude every reasonable doubt from the chancellor's mind.'" Suhre v. Busch, 343 Mo. 679, 123 S. W. (2d) 8. See also La Rue v. La Rue, 317 Mo. 207, 294 S. W. 723.

We are not convinced that the able chancellor, who was in a better position than we to judge the credibility of the witnesses and the inferences to be drawn from their testimony, erred in holding that the plaintiff failed to sustain the burden of proof to the degree of proof in this case required.

The judgment is accordingly affirmed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.