Mark S. COHN, Respondent,

v.

JEFFERSON SAVINGS & LOAN ASSOCIATION, a Corporation, Appellant.

No. 48211.

Supreme Court of Missouri,

Division No. 2.

Sept. 11, 1961.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 9, 1961.

Henry Ebenhoh and Walter S. Berkman, St. Louis, for defendant-appellant.

James H. Meredith and Hyman G. Stein, St. Louis, for plaintiff-respondent.

BARRETT, Commissioner.

The subject matter of this action is 83.77 acres of land at Big Bend and Geyer Roads in St. Louis County on which the Redemptorist Fathers once operated St. Joseph's College. In October 1958, the defendant, Jefferson Savings and Loan Association, purchased the land from the Redemptorist Fathers for $540,000. In this action in two counts it is the theory of the plaintiff, Mark S. Cohn, (1) that he engaged the defendant, through certain of its officers, to finance him in the purchase of the property, that out of the engagement a "confidential" relationship arose and therefore when the defendant eventually purchased the property and took title in its name a constructive trust arose in his favor, and (2) that he and the defendant entered into an additional oral agreement by which they were to develop the property, build 185 homes—the defendant furnishing all the capital, and equally divide the profits, and because of the defendant's failure to carry out this agreement he has lost a prospective profit of $600,000. In its finding and decree as to the first count the trial court adopted the plaintiff's theory, found that the defendant orally agreed to purchase the property for the plaintiff, that there was a "fiduciary" relationship, and that the defendant's purchase of the property was a breach of the relationship and therefore the court decreed a constructive trust in favor of the plaintiff. To carry out and enforce the constructive trust, the court decreed that the plaintiff, within 90 days, should pay into court "toward the purchase price" $100,000, that the defendant should convey the property to the plaintiff and loan him $440,000, for three years at six per cent interest plus one per cent service charge, secured by a deed of trust providing for proportional releases upon proportionate payments of the indebtedness. The court found, however, that the proposal to share in the profits of a building venture had not been entered into and therefore the court found against the plaintiff on count two of his claim and he has not appealed from that part of the judgment. The defendant, Jefferson Savings and Loan Association, has appealed from the decree against it on count one and contends that upon this record the trial court erroneously declared a constructive trust in favor of the plaintiff Cohn.

These were the circumstances in which this controversy had its origin: On September 24, 1958, Cohn and former acquaintance Robert W. Meyer, secretary of the defendant company, met over coffee at a restaurant. In the course of their conversation Cohn told Meyer that the St. Joseph College property could be purchased and he inquired whether Meyer's company, the defendant, would be interested in han-.

dling a loan. Meyer thought a loan possible and made an appointment for Cohn to immediately meet the defendant's executive vice-president, Kuenneke, at the company office. Cohn and Kuenneke had never met and Cohn had never had a business transaction with the savings and loan association. When they met it developed that Cohn did not have a contract to purchase the property, in fact he had no connection whatever with the property. Nevertheless, the appointment and Cohn's and Kuenneke's discussion was the financing of Cohn's purchase of the property, the $100,000 down payment to be furnished by Cohn and the balance of $440,000 to be loaned by the defendant. The fact was that A. J. Buckel and his wife had a written contract with the Redemptorist Fathers to purchase the 83.77 acres for $540,000. The contract was dated August 29, 1958, and provided for $25,000 "as earnest money and as part of the cash consideration." The contract provided for a closing date of October 1, 1958, and was assignable only with the written consent of the parties. Cohn informed Kuenneke that Buckel had the contract and was willing to sell it for a profit of $12,500. Accordingly Cohn and Kuenneke "set up" a luncheon appointment with Buckel and at the lunch meeting Buckel agreed to sell his contract for $12,500. The three of them returned to Kuenneke's office and an assignment of the Buckels' contract was prepared. When Kuenneke asked for the $12,-500 Cohn did not have it, said he could produce it the next day, and Kuenneke gave Buckel $12,500 for Cohn and as security for the defendant's advance took the assignment from the Buckels in the company's name, and as Cohn said, "that was the end of our day." Incidentally, Cohn did not produce the $12,500 the next day and did not repay the defendant for its advance.

The next step, according to Cohn, was to wait for Buckel to return with an extension of the contract and a consent to the assignment from the Redemptorist Fathers. Two or three days passed and the Redemptorist Fathers had not acted on the contract. On October 3 Cohn called Kuenneke and was informed, in Cohn's language that Buckel "could not perform on his contract." Unknown to either Cohn or Kuenneke the fact was that the $25,000 check Buckel gave for the earnest money and as part of the cash consideration was returned for "insufficient funds" and the Redemptorist Fathers refused to grant an extension or consent to an assignment or to deal further with Buckel. Cohn immediately went to Kuenneke's office to discuss the situation and he says that Kuenneke told him that "we would have to enter into a new contract with Redemptorist Fathers, direct. He asked if I had any objection to that. My answer was no." It was at this point, says Cohn, that he asked Kuenneke if he would want any earnest money from him that afternoon but Kuenneke said, " 'No, we will handle it the same way as we handled it before.' " He says that Kuenneke did not say that the property would be purchased "on our account"; he said, "we will buy it for you in our name." In the meanwhile Cohn and Kuenneke "addressed themselves towards the procedures of having a meeting that afternoon with all interested parties."

That afternoon the parties met in the defendant's office, Cohn, Kuenneke, Buckel, Mr. Doering, and Mr. Cuddahee, the latter with their lawyer. Doering and Cuddahee represented George C. Doering Company, realtors, the agent of the Redemptorist Fathers in the sale of their property. These latter gentlemen notified the parties that the Redemptorist Fathers, as of September 23, had rescinded the Buckel contract. (With the $12,500 advanced by the defendant to Buckel, Doering had, however, used Buckel's check or some part of it and had in its possession $25,000.) This meeting lasted from 3:30 in the afternoon until 8 o'clock that evening and about half the time was spent in persuading Buckel to return the $12,500 advanced by the defendant (Kuenneke finally threatening to have him arrested), and the balance of the time was spent in arriving at new contracts and agreements. Among other documents Buck-

-el, upon Doering's returning the $25,000 deposit, executed a "release" of the Redemptorist Fathers. He also executed an authorization to Doering to return to the defendant its previously advanced $12,500. And finally a new contract, dated October 3, 1958, between the Redemptorist Fathers and the defendant was drafted. Instead of executing that document counsel for the Redemptorist Fathers drafted another and final contract of sale of the property to the defendant which the parties executed on October 10, 1958. Cohn was present throughout the October 3 meeting and saw ·or examined all the documents executed that day.

Two or three days after the October 3 meeting Cohn says that he called Kuenneke but the contract had not been signed by the sellers, and then they had lunch together but on that occasion they only discussed the type of houses to be built. Some days later, perhaps by October 13, Kuenneke informed Cohn that the contract had been ·executed. In another telephone conversation Cohn asked for another meeting but Kuenneke was going on a trip to the west coast and suggested that Cohn see him upon his return. Kuenneke returned about the middle of November and in that meeting in the defendant's office they discussed sharing "in the building profits," the defendant to advance the finances interest free and they to share in the profits "50–50." Cohn's explanation of this phase of the transaction was this: "I felt that—my ground would go in at cost and our profit would be figured after I had improved the ground. That would be our building profit." Kuenneke thought a 50–50 split too high, suggested a split of 25–75, and Cohn countered with an offer of a 40–60 split. Kuenneke was to submit or confirm the arrangement and "That was the end of that meeting."

A week or ten days later Cohn again called Kuenneke and he suggested that Cohn get in touch with Mr. Doerflinger, the president of Jefferson Savings & Loan Association and also president of Doerflinger Realty Company. Cohn called Doerflinger and at their meeting they discussed the type of houses to be built, their financing and who would handle the sales. Doerflinger emphatically informed Cohn that his company would handle the "hazard insurance" but Cohn thought they parted with the understanding that Doerflinger would submit to the defendant's board of directors the handling of the sale of the improved property. By January 3, 1959, Cohn again called Doerflinger and was informed that "We have decided to go along without you." It was in this telephone conversation and for the first time to anyone since his initial meeting with Kuenneke that Cohn told Doerflinger, "I said I didn't understand how he could do that. I told him I considered it was my property and didn't understand how they could go along without me and he was subjecting himself to a lawsuit." Jefferson Savings & Loan Association proceeded with its contract with the Redemptorist Fathers, finally paying them $540,000 for the 83.77 acres and on March 19, 1959, Cohn instituted this action.

In these briefly noted but sufficiently illustrative circumstances the trial court decreed, upon the terms indicated, a constructive trust. It is the plaintiff's theory that in their initial dealings a confidential or fiduciary relationship arose, that the defendant was under a duty to purchase the property for him and when instead the defendant paid the purchase price and purchased in its own name or on its own account the confidential relationship was breached and perforce a constructive trust arose. 4 Scott, Trusts, § 499, pp. 3221–3226; Bogert, Trusts, 2nd Ed., § 487, p. 170. The plaintiff concedes that the mere violation of a parol agreement to buy and convey land (Purvis v. Hardin, 343 Mo. 652, 657, 122 S.W.2d 936, 939), or the mere refusal of one who has paid the purchase price and taken title in his own name to convey or to execute a contract does not give rise to a constructive trust. 89 C.J.S. Trusts § 150, p. 1044; annotations 42 A.L.R. 10, 27 A.L.R.2d 1285; Long v. Conrad, Mo., 42 S.W.2d 357. He claims, however,

that these circumstances involve "much more" than a breach of an oral agreement to buy and convey. He points to the fact that he found the seller or the property, that the defendant had no prior knowledge that the property was then available, that the defendant undertook initially to purchase the property for him, that from the undertaking a "confidential" or "fiduciary" relationship (see Bogert, Trusts, 2nd Ed., § 482, p. 132, for the distinction in the terms) arose and, therefore, when the defendant purchased in its name he was entitled to have a constructive trust declared. Restatement, Restitution, §§ 194, 200. To demonstrate his claim that there was a confidential relationship and that the defendant violated its obligations to him, the plaintiff points to the rules of agency and the agent's duty of loyalty, his duty not to compete with his principal or to not deal adversely with the subject matter of the agency. Restatement, Agency (2nd) §§ 387, 389, 393. These abstract rules spell out the duties of agents and fiduciaries, however, "as that duty is defined by the substantive law which governs the particular fiduciary relation." 4 Scott, Trusts, § 495, p. 3216. And in this connection it must be noted in general that a constructive trust is an equitable device to prevent injustice, particularly unjust enrichment. Bogert, Trusts, 2nd Ed., § 471, p. 3; 89 C.J.S. Trusts § 142, p. 1027; Restatement, Restitution, comment p. 642; Trieseler v. Helmbacher, 350 Mo. 807, 816, 168 S.W.2d 1030, 1036.

Upon this record, casually read, the plaintiff verbally, perhaps technically, testified to a text book constructive trust, but it does not follow that he is entitled as a matter of right to the equitable remedy. Trieseler v. Helmbacher, supra; Evans v. Evans, 196 Mo. 1, 93 S.W. 969. In the first place, unless and until he complies with the trial court's decree, the plaintiff has not performed or even tendered performance of the agreement testified to by him. The first phase of the transaction, the Buckel contract, aside, the plaintiff, according to his version of the agreement, "had $100,000

that I could invest in the property." Even after the collapse of the Buckel phase of the transaction, Cohn "definitely promise[d] $100,000 toward the down payment of this property" and the defendant was to loan him the balance of the purchase price, $440,-000. His excuse for not producing the $100,000 was twofold; first, he was waiting for Kuenneke to tell him in what form the defendant wanted the $100,000, and, second, he said that when he asked Kuenneke if he would want the "earnest money" on October 3 Kuenneke replied, "No, sir. We would handle it the same as we had before" (meaning the way the $12,500 was handled). But this latter view changes the agreement from Cohn's advancing $100,000 toward the purchase price to the defendant's loaning him $540,000 instead of $440,000. Although Cohn claims that he was obligated to the defendant for $100,000 he did not sign a note or any other contract document and except for his verbal promise there is nothing to indicate that he was bound to pay this large sum.

Cohn, through a corporation, had developed another tract of land in St. Louis County known as Windsor Forest, on which 57 homes in the $35,000 to $40,000 bracket had been built and sold. The lots averaged one acre and there were 37 undeveloped lots in the subdivision. Cohn says that his equity in this development was in excess of $100,000 and it was from this source that he was to obtain the $100,000 to "invest in the property" or use as the "down payment." Another reason he gave for not producing the $100,000 was that Kuenneke did not tell him whether he was expected to sell his interest in Windsor Forest or whether he was to borrow the money on Windsor Forest, the defendant also furnishing that loan. Cohn said that his equity in Windsor Forest exceeded $100,000 and for the purposes of this opinion it is assumed that it had that value. However, he called an expert to testify to the value of the property and the witness attributed a value in excess of $100,000 to Cohn's equity. This witness said that his company would

have loaned 50% of $192,000, but there was an indebtedness of $50,000. "Q. So you are not prepared to tell His Honor that he would have available from his equity $100,-000.00 from the sale of that asset? A. The answer to that is no."

This is not to say that it was necessary, as a prerequisite to relief, for Cohn to have paid or tendered the $100,000. It is to say that if he had done so or had plainly obligated himself to do so that the bona fides of the transaction would have been manifest. Long v. Conrad, Mo., 42 S.W.2d loc. cit. 361; Ferguson v. Robinson, 258 Mo. 113, 167 S.W. 447. In these circumstances the mere offer in the plaintiff's petition "to do equity" is not compellingly persuasive. It is not the theory of this case that there was a resulting trust but if Cohn had in fact advanced either money or property he would have been entitled to relief on that account. Annotation 42 A.L.R. loc. cit. 21; Decker v. Fittge, 365 Mo. 139, 276 S.W.2d 144.

His case would have been stronger if he had had a contract or an option to purchase the property and the defendant had then agreed to loan the purchase price or a part of it and take title in its name as a security device or for his benefit. Annotations 42 A.L.R. loc. cit. 24–25; 27 A.L.R.2d 1285. And initially that was the agreement and the parties attempted to carry it out but Cohn did not have either an option or a contract and Buckel obviously had but little to sell. Another distinction, Cohn had never owned or had an interest in the St. Joseph property and he was not in the position of a beneficial owner induced to refrain from bidding or otherwise acting to protect an interest about to be lost under a mortgage foreclosure or a judicial sale. See and compare: Swon v. Huddleston, Mo., 282 S.W.2d 18, 55 A.L.R.2d 205; Jackson v. Tibbling, Mo., 310 S.W.2d 909; Musser v. General Realty Co., Mo., 313 S.W.2d 5.

The principals to this transaction, Cohn and Kuenneke, were strangers until they met on September 24. Bogert, Trusts, 2nd Ed., § 482, p. 136. As indicated, Cohn is in the business of buying real estate, building houses and selling them. In addition, he is a licensed real estate broker and as he said with regard to contracting directly with the Redemptorist Fathers, he did not need Kuenneke's services but "he volunteered to do it for him" and Cohn was eminently satisfied with the manner in which Kuenneke handled Buckel and the transaction in general. It may be that a "volunteer," "even though the undertaking is gratuitous and oral" (4 Scott, Trusts, § 499, p. 3224), may become an agent or a fiduciary and thus subject himself to the hazard of having a constructive trust declared. But the relationship between Cohn and Kuenneke was not the conventional one of a layman employing a real estate agent to buy or sell property. Compare: Curotto v. Hammack, 362 Mo. 457, 241 S.W. 2d 897, 26 A.L.R.2d 1302; Utlaut v. Glick Real Estate Co., Mo., 246 S.W.2d 760. This is not to say that one real estate broker may not become the agent of another broker or that one developer of real estate may not become the fiduciary of another developer. It is to point up, however, the fact here that as between Cohn and Kuenneke there was no "dominant" party, no disparity of position, or because of their relationship a consequently resulting superiority of position—all factors often emphasized as manifestly compelling the imposition of a constructive trust. Bogert, Trusts, 2nd Ed., § 482, pp. 137–138; 89 C.J.S. Trusts § 151(b), p. 1057; Gates Hotel Co. v. C. R. H. Davis Real Estate Co., 331 Mo. 94, 52 S.W.2d 1011. While the future of this particular development is entirely speculative, despite the prediction of $1,200,000 profit, the parties evidently consider it "a very good thing," but as between Cohn and Kuenneke its acquisition and development was a hard-fisted, cold-blooded deal, strictly a "morals of the market place" transaction. While equity demands a higher standard than "the morals of the market place" (Bogert, Trusts, 2nd Ed., § 488, pp. 181–182), except for Cohn's

assertion that he did not learn of the execution of the final October 10 contract until long after the fact (he knew all there was to know about the October 3 draft and the terms were substantially the same), there was no concealment or deception in the transaction. Bogert, Trusts, 2nd Ed., § 482, pp. 150–153. Both parties were aware of and fully understood all the facts and circumstances. In contrast, Jackson v. Tibbling, supra, and Warsofsky v. Sherman, 326 Mass. 290, 93 N.E.2d 612, relied on by Cohn, compellingly demonstrate the facts creating a confidential relationship and the circumstances manifestly demanding the imposition of a constructive trust.

All the circumstances have not been detailed and analyzed in this opinion as the parties have presented the case in their briefs, and all the permissible inferences have not been set forth and balanced. But in addition to the illustrations, the record in its entirety has been carefully weighed and once the Buckel phase of the transaction is passed the essence of this case at its best is a mere oral agreement "to purchase land and give another the benefit of the purchase by conveying to him the land at the price at which the property was acquired" (annotations 42 A.L.R. loc. cit. 13; 27 A.L.R.2d loc. cit. 1288), and in those circumstances the imposition of a constructive trust is not appropriate. Purvis v. Hardin, supra; Long v. Conrad, supra; Gates Hotel Co. v. C. R. H. Davis Real Estate Co., supra. It should be noted, perhaps, that the most eminent of authorities have questioned the complete soundness of the Long and Purvis cases (4 Scott, Trusts, p. 3226; Bogert, Trusts, 2nd Ed., § 487, p. 174), but this cause does not turn alone on the principles announced in those cases, this court in reviewing the cause anew (V. A.M.S. §§ 510.310, subd. 4, 512.160, subd. 3; Sup.Ct. Rule 83.13, V.A.M.R.; Jackson v. Tibbling, supra) is unable, with all deference to the trial court, to find the essential facts or attribute to them the inferences claimed by the plaintiff. For the reasons indicated, the judgment is reversed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.